It's going to be 100 degrees again in Houston, so we're appreciating that cold snap. We have three very interesting cases on the docket this morning. Please try to adhere to the time constraints. The yellow light comes on at two minutes and will signal that you should wind down. Please conclude your remarks when the red light comes on unless the court is asking you a question. Also, we are very familiar with the briefs and record excerpts. Several of these records are quite voluminous, so we do not purport to know the entire record, and therefore we appreciate citations to the record. First case is No. 22-20463, BMC Software v. Intl Bus Machines. Mr. Clement. Good morning, Your Honors, and may it please the Court, Paul Clement for the appellants. I'm going to endeavor to save three minutes for rebuttal. The decision below converted an ordinary contract dispute governed by strict damage caps into a $1.6 billion windfall. That conversion depended on misconstruing the contract, finding fraudulent inducement where the parties were crystal clear that they differed on the meaning of a critical contract term and overriding clear damage limits in the contract. The district court's decision and its windfall award cannot stand. The parties here have always fundamentally disagreed about the scope of the restrictions in Section 5.4 of the Operating Agreement entitled Non-Displacement. The same basic language was in the 2008 Operating Agreement and the 2013 Operating Agreement, and the parties steadfastly disagreed about whether it prohibited customer-initiated switchovers, so when the idea wasn't IBM's but was the shared customer. And there were incidents involving the Bank of Ireland and the National Australia Bank where it was clear to both parties that IBM took the position that if the customer initiated the switchover, then it was a discontinuation for other business reasons that was allowed by the agreement and not a forbidden displacement. Now, the parties had that dispute when they were negotiating the 2015 Operating Agreement. Both sides tried to disambiguate, if you will, the contractual language by offering language that would have made their preferred construction unambiguous, and neither party would budge. How does the timing of the Swallowtail Project fit in with the renegotiation in 2015? So I don't think it really fits in particularly. I mean, just chronologically, that was going on, and so when the negotiation was taking place, IBM had it in its mind that the Swallowtail Project, which was AT&T-initiated, would be consistent with its interpretation of the contract. Is it undisputed that it was AT&T-initiated, or was that a fact question? So I don't think it's any longer disputed because I think at the beginning of the case it was disputed, but the district court here found as a matter of fact, and my friend on the other side has not appealed, the determination that it was AT&T-initiated. And that's a clear finding of fact, and it was crystal clear and important because that was essentially the basis for rejecting their argument that we breached not only 5.4 of the Operating Agreement but 5.1 of the Operating Agreement because 5.1 says you essentially have to, when you're using, if IBM and its servicing is using AT&T's licenses rather than buying our own, then we can only use those licenses for the customer, i.e. AT&T's benefit. So that was a critical aspect to the judge's finding that there was no breach of 5.1. It was also a critical finding in finding there were no sort of lost profits damages here, at least based on the theory that BMC offered below, because the theory would be, well, the starting point for measuring a damages violation of the 5.4 breach would be to say, well, what's the but-for world? The but-for world, you might think, would be, well, BMC still has AT&T as a customer and as a result continues to earn $5.6 million each year in servicing revenue. And the district court rejected that because it said, well, you're not going to earn that at least in perpetuity because AT&T made the decision that it wanted to oust your products. And then the district court, and this is all on page 64 of his opinion, but he specifically then says, look, you could have offered a more modest damages theory. You could have said, well, if IBM can't do it and some third party that's unrestricted by Section 5.4 would be the one that executed AT&T's decision, let's say that would take two extra years and that would yield a damages award of $10 million and in our view that would still be subject to the $5 million cap and this would be a $5 million case and it probably would have been settled long ago. I know you dispute the breach, but assuming the breach, the district court rejected the lost profits model, the contract itself with all the negotiations does not have a provision, you know, thou shalt not breach but if you do, X, right? It does not. But actually I think the damages award is only consistent with a contract that had that language. But that language is just not in this contract. Was that purposeful that, I know you said it was a lot of back and forth, you know, one preferred language, et cetera. Was it deemed, was it purposeful that the contract didn't specify what happens with a breach? Absolutely, Your Honor, because BMC tried to insert in the 2015 negotiations a provision that would have said, all right, here's the consequence of violating the nondisplacement obligation in Section 5.4 and it's you must purchase licenses at a particular price. And IBM successfully resisted that. That's not in the contract, certainly not explicitly, and it's not in there implicitly either. There's just no direct connection. Indeed, the way this contract is set up, Section 1.1 gives IBM in doing its servicing, gives it a clear choice. It can either use AT&T's license subject to certain restrictions in Section 5 or it can buy its own licenses, which would be unrestricted. And there's no dispute here that IBM took the access and use option, and if it took that option and then violated one of the restrictions in Section 5, there would be damages, but the damages wouldn't be the result of a hypothetical negotiation for licenses that would allow us to do much broader things under Section 8. It should just be prove up your damages. And as I say, it's not like it's impossible to prove up damages in a context where the customer wants to move on. If they'd proven it would have taken longer to use a third party, you could have had $10 million, a more modest damage amount, but there's just no way to get to this $717 million windfall under the language of the contract. And one thing that's important to be clear about is Well, now they use the provision on liquidated damages, $5 million or the value of a license, right? Right, but I think that's kind of the ultimate insult to injury because that's clearly a limitation on damages. And so you can't go to Section 10 of the MLA and say that limitation on damages is actually where you get a much larger kind of almost like liquidated damages amount. That just kind of turns that provision 100% on its head. And so I think that was one of the clearest errors here. And I think it's important to recognize that even if you got to some damages award and then you were looking at the cap in Section 10, I do think the operative provision there would be the $5 million limitation, not the pay or payable language, because that pay or payable language clearly envisions a situation where we actually bought our own license. That assumes that there's some license in existence, not that we're contemplating what license might have been. Exactly. It assumes an actual license, not a hypothetical license that's been sort of conjured up. And one other thing, just in responding to your answer as fully as I can, Judge Stewart, there were provisions in the contract in Section 12 that operated differently and had the kind of language that could support this kind of award, because they basically said if you want to do shared hosting, you need to buy your own license, IBM. And then if you nonetheless do shared licensing and don't buy your license, then you have to, the penalty for that is basically 125% of what you would have paid for the license. So the parties clearly knew how to put in a provision that says if you do X, the penalty under this contract is Y. And that language is not in there. 5.4 is entirely prohibitory. It says you can't do this displacement, and if we assume for purposes of this question that that includes customer-initiated displacements, then the consequences should be some damages theory. One other quick question. On the breach itself, I mean, the trial court ruled on several things on summary judgment, as you mentioned, the lost profits. We go to full-blown trial on the bench, on the breach, he finds the breach. I know that's hotly disputed, but, I mean, is there any difference on the finding of the breach intertwined with these facts that were, you know, adduced at the trial, or is that strictly de novo, just us reading the contract and thumbs up or thumbs down? So, Judge Stewart, here's the way I think about it. The question of whether the contract is ambiguous is a pure matter of law that he decided on summary judgment that is de novo review. So I think the question that's sort of squarely presented there is the fact that 5.4 prohibits even a customer-initiated changeover. If you think the contract unambiguously prohibits a customer-initiated switchover, then we don't really have an argument that under that interpretation of the contract there wasn't a breach. But we think that he erred at summary judgment that this contract is almost a poster child for an ambiguous contract. I mean, both sides tried in the negotiating process to disambiguate it, and both efforts were rejected, so we're left with this displaced but don't discontinue for other valid business reasons. I think Professor LeBron's amicus brief does a good job of explaining kind of why in this kind of arrangement where BMC and IBM don't really love the fact that they're contracting with each other, but they sort of both need each other to service the third-party AT&T, why you might have ambiguous language and you might have a dynamic where the parties agree. That raises an interesting question about the amicus briefs. At some point BMC has a little footnote that says that several of these amicus briefs on IBM's side are by parties that have either a direct or indirect financial interest, Professor LeBron being married to one of the counsel in the trial court for IBM. Is that common, and should that kind of thing be disclosed by the amici? I don't know how common it is. Well, you know a lot about amicus briefs. I do, I do, and I do not think that is something that would need to be disclosed. That one in particular, I mean, my friend on the other side is free to make his choice. I would not have included a footnote along the lines in the appellee's brief in my own brief. I find it intriguing and worthwhile, frankly, since we're all concerned. We have to recuse if we have the smallest imaginable financial interest, and it just seems, although I realize, you know, if you have AP, anyway, I won't orate about it. Yeah. Well, it's before the court now. You can take it with a grain of salt if you want. So your position is that the contract was ambiguous? That is our position, certainly on appeal. I mean, in the first instance we said it's unambiguous in our favor. Well, if it's ambiguous, then it was subject to fact-finding, right? Sure. So it would have to be. So how do you get to the conclusion as a matter of law that we must reverse because it should be interpreted your way? Because there was no fact-finding on the premise that the contract was ambiguous. Because, remember, he said that 5.4 was. But Christina Bryan, the magistrate judge, said it was ambiguous, which is undoubtedly why all that evidence came in about Klein and the other fellow and all their negotiations. So there's evidence in the record, right? Well, but there wasn't evidence in the bench trial before Judge Miller. So that might have been before the magistrate judge. That's true. Right. So we would have to have a new bench trial if you conclude that the contract is ambiguous. It just comes back to kind of ‑‑ I don't want to belabor the point, but the question I was trying to ask you, maybe I didn't ask it artfully enough, was you had a bench trial. He decided certain things. He rejected what the R&R was. Decided somebody's judgment. But you go to trial. Each side says my view of the contract is correct. Dot, dot, dot, and you go to trial. It wasn't tried on the notion that the contract was ambiguous, right? Not as to 5.4. On 5.4, the bench trial takes place. The notion that each side, my view is the right view, correct? Well, no. Actually, it was tried on the premise, based on the summary judgment ruling, that 5.4 was unambiguously against us. Right. So we couldn't at that point engage on that issue at all. And on 5.1, he said it was ambiguous. And if you were to consult the entire bench trial record, the back and forth on 5.1 is quite different than the back and forth on 5.4. And we were quite careful in the bench trial, especially because it's a bench trial, to sort of take as a given his conclusion that, okay, 5.4, we can no longer argue that that is ambiguous. You know, look, in fairness, a lot of the same evidence came in in the context of the back and forth over the fraud claim. And because I have three minutes left, I should turn to the fraud claim. You know, we started in our briefs with the contract claim just to make clear how this all works together because we think it's the logical place to start. But as the case comes to this court, it's the fraud claim that is the basis for the $717 million compensatory damages award. And the fraud claim is, I think, concededly both the basis for the punitive damages award and the only justification for ignoring the damages caps in Section 9 and Section 10. So the fraud claim is very integral to the case. It's just that the fraud claim is kind of premised on the idea that the contract was unambiguously against us and we knew it all along somehow. But there's a lot of things wrong, I think, with the fraud claim. But the thing that I think is most glaringly wrong with the fraud claim is justifiable reliance. Because whatever else Judge Miller found, he didn't contradict the notion that the parties made quite clear that they did not meet eye to eye on the meaning of this clause, particularly as it applied to customer-initiated switchovers. BMC was fully aware, even at the CEO level, that IBM continued to take the view that this clause allowed us to do customer-initiated switchovers. So even if you don't think that's the right view of the contract, it was clear to BMC that that was our view of the contract. And under Texas law, there's this trio of cases, the Grant Thornton case, the Orca case, and the Carduco case. All of those are in our briefs. All of those make clear that there's no justifiable reliance under Texas law in the face of red flags. And I don't know how you could have kind of more vivid red flags than the Bank of Ireland experience where we say we can do this because it's customer-initiated. They, of course, BMC says, well, we don't agree. They said you indemnified Bank of Ireland or Australia, one of them. Well, and we have a provision in this contract that if AT&T sued, we'll indemnify them as well. But I don't think that really changes the fact that we took the position we could do this. They took the position that we couldn't. They knew that was our position. It happened again with National Australia Bank. What about the Formosa Plastics case? They rely on that pretty heavily. I know they do, and that's quite a different situation. I mean, I think the only thing they can get out of Formosa Plastics is the idea that you can have a fraudulent inducement claim in Texas even if it arises out of a contract. And so Formosa Plastics rejects that kind of broad argument. But then after Formosa Plastics, because Texas allows some fraudulent inducement claims that arise out of a breach of contract, they have to essentially cabin this doctrine. And they cabin it largely by saying that, you know, for justifiable reliance, you can't ignore these kind of red flags. And I think Bank of Ireland and National Australia Bank are clear red flags. But what's even clearer is the fact that in the negotiation process, we say that we think this allows us to do customer-initiated switchovers. And, you know, if I continually tell you that I'm going to run my car over your foot and you say, no, you're not, and I say, yes, I am, yes, I am, yes, I am, and then I do it, I mean, you might have a bad reaction for that, but you don't have a fraudulent claim because I made it as clear as I could that I had a certain view that I had a right to do something. I see my time is up, so I'll save my time for rebuttal. Thank you, Your Honors. Mr. Oldham. May it please the Court. Jeff Oldham for BMC. IBM made promises to BMC that it never intended to keep. IBM knew full well what the party's contract meant, including... Mr. Clement says this is basically a fraud case and not a contract case. Is this contract provision really unambiguous in your view? We think it is absolutely unambiguous. So other valid business reasons means nothing? Other valid business reasons does not modify the word displace. It modifies the word discontinue. The one thing that the contract says that IBM cannot do is displace BMC products with IBM products. The clause that follows that, IBM wants you to read that as an exception. Look at the language. It is not an exception. It doesn't say you cannot displace BMC products with IBM products except in this circumstance. What it says is you can discontinue for other reasons. IBM's reading would read the word other out of the contract and would read the words with IBM products out of the contract. What it clearly says is you cannot do one thing, and that is displace BMC products with IBM products. But for other reasons, you can stop using them. They use different words there, too. Displace and discontinue don't mean the same thing. And if they meant the same thing, the parties would have used the same word twice. They didn't. So this language is crystal clear. You cannot displace BMC products with IBM products, full stop, no exceptions. It doesn't matter who asked for it. Next clause, but you can stop using for other valid business reasons. So they argued over it for five years, and now you're saying it's so clear nobody could possibly object. Yes, and I think Your Honor should look at Judge Miller's findings, because the statements that my friend on the other side has talked about where IBM over the years apparently said that, you know, they could do customer initiated, the district court found those were lies. And I'm not exaggerating. The district court said in about eight different places in his findings that IBM did not believe them. IBM did not fully believe them. The district court couldn't. Suppose we were to, and I certainly don't discount that information or evidence, but suppose we were to find that the contract was ambiguous, and the parties are arguing for five years on both sides of the ambiguous contract, then how can they be guilty of fraud if the contract is ambiguous? Because there is evidence that goes well beyond breach here. The district court found, and they haven't really challenged this clearly erroneous, the district court's findings that they lied, that those things they were saying were smoke screens. They were throwing out smoke screens from the beginning. We think that if AT&T or some client comes to us and validly says we need to use your product and not BMC's, then we know we can't make that changeover, but we're going to argue otherwise. Yes, because I think in the under- So where's the proof that they knew that the contract was unambiguous the other way? So there's a variety of different proof. One, I think the court has to look, as the district court did, to the training manuals. There are a number of internal training manuals that the district court relied on heavily over the course of all of this where they were basically teaching, not basically, they were teaching their employees worldwide that the OA gives a clear choice, choice one or option one. You could use the client's license for free or for no additional fee, but you cannot displace, including some of the slides say where the client wants the displacement. You cannot displace. Option two, if you want to displace, you have to buy your own licenses. The district court relied. This is training. They don't disagree with that. Displace, right? I'm sorry? They don't disagree with that if they want to displace. Correct. That doesn't go to the question of if the client asks them, does it? If the client comes to IBM and asks IBM to do something that it has plainly prohibited by contract from doing. That's a circular argument. I disagree. There's nothing in Section 5.4 that says if the client asks for it, then they can displace. Other valid business reasons include the client says that's what we insist on. But, again, if you look at the language, it says you can discontinue. In other words, stop using. But for other reasons, what does the word other mean? It follows the clause that says you can't displace BMC products with IBM products. So the one valid, the one reason you can't stop using BMC products, the language makes clear, is to swap in an IBM product. That is the one thing prohibited by this. There's nothing about Section 5. What do you say for other valid business reasons was meant to be? So there are a variety of other valid business reasons that are present in this exact case. There was 14 products that were swapped with IBM products. There were five products that were swapped with third-party products. That would be a discontinuance for an other reason because you're doing it other than to swap in IBM products. You're doing it, you're swapping in a third-party product. There was one product here that was just retired. In other words, not swapped in with anything else. AT&T decided they didn't need the product anymore. And the record showed that that is actually not uncommon at all, that oftentimes a client would come and say, in our mainframe, we no longer need the functionality presented by this product, so stop using that one. And the contract makes clear that is an other valid business reason, and you absolutely can stop using it for that reason because you're not doing it to swap in your own products. That's what the contract makes clear. There's nothing about the language that says that there's an exception that they can displace with IBM products depending on who asked for it. There's nothing in there. And there's nothing about the purpose of Section 5.4 that would allow that. The whole point of 5.4 was to stop IBM from using its position and access and knowledge that it gains from this to basically compete on software. Did the district court find that IBM did that, used its access to AT&T's licenses for an unfair advantage, or did it find that? Yes, it did. Where? So page 8469 of the record is where the district court is talking about, like, the antitrust. And then I think the breach itself, I mean, I think the breach itself was using. This wasn't really disputed at trial. Once the district court interpreted the language, then it was really no question. And the testimony on that was in part from our technical expert, Roman, who testified, and this is at 11-689-92, also at 11-707-08. Mr. Roman testified in detail the fact that they actually used this product. And if I could, you know, it gets a little techy. But what he explained is this is not a simple switchover. I think the word switchover conjures in your mind the notion that this was flipping a switch and it was done. This took three years, and they had to use BMC's product to get it done. They couldn't do it without it in the way they wanted to do it. They were parallel testing. If they did it under AT&T's license, BMC lost nothing, right? And they absolutely had no right to do it under AT&T's license. Well, under 5.1, access and use, it appears that they would have. That is incorrect, Your Honor. I'm only assuming that 5.4 is susceptible of IBM's interpretation. We had an entire trial about the issue of whether they could use AT&T's license. The district court rejected their position as a matter of fact and a matter of law, and they have not appealed that. I'll point the court's analysis to 8458 through 60 that arose in the context of whether BMC performed its obligations. And the district court held factually, legally that they had no right to use AT&T's licenses. And that's obviously correct. The fact that I buy a Microsoft Office and install it on my computer doesn't mean that I can just give it to you and you can install it. You all have to pay for your own rights to licenses. This is a completely different situation than a consumer purchase. We disagree. The fundamental nature— Five years. You're saying IBM was lying to BMC for five years. That's correct. What they were doing was throwing out smoke screens as the district court found. And, again, I would urge the court that under a clear air standard, the court would have to find clear air to disagree with the district court. We've heard all this evidence. What do you say about the New York restrictive covenant law? In other words, IBM is not competing with BMC in the market for outsourcing, right, or for taking care of these products. BMC isn't in that market, which is why they had to contract with IBM. So BMC is foreclosing IBM. Because IBM then has to hire a third party to go and do the switchover. That's one aspect of restriction. The other is this looks like a naked market division if it's interpreted the way you say it. We will not compete with you for such and such product. Isn't that close to a per se Section 1 Sherman Act violation? No, we disagree. And they did not bring a per se claim to trial. What this was is a reasonable I don't care whether they did or not. New York law prohibits restrictive covenants. That is the archetypal restraint against trade. And this is a simple use restriction. I think an unquestioned first It's not a division of markets. Because I think a first principle we can all agree with is that BMC did not have to give any rights to its licenses. It had no obligation to give anyone rights. This was IBM needing those rights. BMC willing to give those rights. And they came to a reasonable use restriction that said BMC needing the services that IBM could provide. And the question was under what conditions IBM would provide those services to BMC customers. And BMC is insisting you can't compete for our customers. And we disagree on almost every step of that. That's the way you interpret 5.4. You can't displace means you can't compete for our customers. They absolutely can compete. But they have to pay for the rights that they use. That's the only issue here. They had to pay for the rights. That's all that we're asking. We didn't have to give them any access to our rights. But we were willing to do it because it was a two-way street. It wasn't just BMC that wanted these rights for IBM. IBM needed these rights. They couldn't do their job without these rights. They negotiated and they agreed, fine, you can compete. This doesn't stop IBM from competing for a single customer. It can go and it can displace anyone it wants to. It just has to pay the price that the parties agreed to. And these are very sophisticated parties. If you knew what IBM wanted to do here to get AT&T's business, it would have had to pay $717 million worth of licenses? Because the parties agreed to that. Just as a matter of fact, if IBM wanted to get AT&T's business, it would have had to pay $717 million? I'm sorry, say that again. It would have had to pay $700-something million to get the AT&T business? Yes, because that's the licensing formula that the parties agreed to. I know, but that depends on your understanding of that part of the contract to do that. The switchovers that were going on here, they didn't cost $717 million, did they? Absolutely they did. I think for your Honor to believe that, you would have to think that IBM, a sophisticated party, made a mistake in negotiating this. The license formula depends on the size of the mainframe user that is at issue. Here, AT&T is the world's largest mainframe user. And so the license price goes up or down and kind of spits out a number from the formula depending on that. We're talking about the world's largest mainframe user. There's no provision, but that would have been like damages. The judge sort of cobbled together because he didn't find this. He said there's no breach of Section 1.1. That's correct. And so the reason why these damages flow directly from a Section 5.4 breach is if Section 5.4 means what it says, there is only one way under the outsourcing attachment, the OA, where you can actually displace, and that is Section 8. You have to buy your own licenses. And again, if you look at the training manuals where IBM taught its own employees how to use the OA, this choice was clear. You have to buy your own license if you want to displace. If you don't want to displace, that's fine. You use the client license. This was crystal clear to IBM even internally. And by exceeding the rights under Section 5.4, in other words, saying we're going to stick within Section 5.4, but exceeding those rights and using the rights available only under Section 8, they use those rights. And all our license fee damage model asks for is to make them pay for the rights that they use. It's that simple. It doesn't matter what choice you make. It doesn't matter if you say I'm going to do this. If you actually then go and, under the contract, use the rights that they needed to use for displacement, they have to pay for those. The first approach at what was owed for the breach was lost profits, right? Incorrect. That was not our first approach. That is what IBM likes to focus on. And I want to be very clear about this because they try to say that we're limited to AT&T $5.6 million. $5.6 million a year is not what we lost. What we lost is they took our intellectual property. That's what we're here talking about. The consequential damages that they want to talk about with AT&T is just that. It's a consequential damages. If you read Biotronic or Tractabel in the New York law or you read Formosa or other cases, the law is well settled. You have direct damages and you have consequential damages. What they're trying to say here is that we can't get our direct damages, in other words, what IBM owes under our contract, because we couldn't prove consequential damages. Where in the contract does it delineate, thou shalt not breach, but if you do, here's what happens. So somebody can take that risk. I'm going to breach it, but it's worth it. So how does one read the contract and define that it flows all of what you said? Section 5 and Section 8 are the two options, and Section 1.1 merely makes IBM make a choice. But when you read those two provisions together, as IBM did for years and the way it taught its employees, it's a clear choice. If you want to displace, you have to buy licenses. Now, the thou shalt not language is another way of going about the same result, but if this court is to hold you have to have that in every single contract provision in order to get a remedy, it's going to revolutionize. I'm sorry. The contract was fought to the hilt all the way up to the edge. Nobody got what they wanted. It's got compromise language all over the place, et cetera, et cetera. Each party needs each other, et cetera, yet you get a finding of a breach after a trial, and it's to say, do you look at this document and here's this long string of worth $717 million. It was a three-year contract, so if they'd stayed in for the whole three years, $717 million would have been the dollar sign? This contract was clear from day one about the options they had. There's nothing about this that's clear. We believe it is, and the district court found it is. The district court also heard all the evidence. What it's worth, the magistrate judge found the opposite. Well, on Section 5.4, she did find that that was ambiguous. Well, they all disagree. Does that mean we're all wrong and you're right? No, but I think the way you have to look at it is what the contract provides. It gave options, and so IBM talks about a pre-breach world, and what they want this court to do in a but-for pre-breach world is go back and just myopically focus on where AT&T is in that world, but you have to look at it. That's only half the picture. You have to look at where BMC is in that world. BMC has its valuable licensing rights intact in that but-for world. IBM used BMC's intellectual property without paying for it. In that but-for world, it would have those rights back. Now, you can't go to that but-for world because, of course, you can't un-use or repair intellectual property rights. So I understand what you're saying because this is different from the briefs, in my opinion. The damage here is the loss of the intellectual property, not the loss of the opportunity to have AT&T as the major client. That is absolutely correct, and we have argued that in our briefs. And you're saying there's a finding by the district court that the loss here was of intellectual property, not I lost my client. The district court talked about the value of intellectual property rights. That is what is represented by the direct licensing fees that we were awarded. Absolutely. The license fees under the contract are the fees that IBM owes for the intellectual property licensing rights that it needed in order to do things, in order to perform its outsourcing. So it didn't have to pay anything for- You're saying it would have had to purchase $717 million worth of licenses to execute the switchovers that it did, that you say it shouldn't have done. That's exactly right. That's what the sophisticated parties agreed to, and that value of those licensing rights is reflected in the plain terms of the OA. And it's, again, not surprising. IBM, by the time it had agreed to the 2015 OA, it had to do Project Swallowtail. It needed those rights because it had already bound itself to do that. And the record shows that it desperately wanted to do it. AT&T was the world's largest mainframe user, and IBM desperately wanted their business. And so, absolutely, this may be a case where they didn't want to pay $717 million, and that's why we have a fraud claim, because they simply just decided they could take the rights without paying for them and gambled that they would settle for pennies on the dollar. They said they could use the access and use clause, and therefore AT&T's existing perpetual licenses in order to make the switchover. It's not a matter of paying nothing. BMC was paid by AT&T for the software. That would revolutionize licensing if this court were to hold that because one party paid for its rights, now every other party gets to use them for free, notwithstanding the language. It depends on what the contract says. Absolutely, and the district court looked at that. What would arguably revolutionize licensing is to say that in a hotly disputed license agreement that's existed for close to 20 years, but at least eight years under dispute, that suddenly what's been disputed for eight years is now a matter of fraud. That's what would revolutionize contracting. I would again point the court to the district court's resolution of the issue of whether IBM could use AT&T's rights. They were not clearly around his findings, and it was square as a matter of law, and again, that was 84-58-60. The court rejected that argument, and IBM has not appealed it. I want to turn quickly with the last minute or 30 seconds I have to damage caps. Just to be very clear on damage caps, we can all agree on the first principle that parties' bargains should be enforced, but in this case, IBM agreed to a second principle, which is that the Kelice-Sharko doctrine under New York law limits when the contractual damages provision can be enforced. IBM agreed to that. They can't weasel out of the agreement now and say that they don't like that, that that's not the law. How do you get punitives? I have trouble following the money. $770 million, and then you get punitives as well in a document that doesn't spell all that out. We know what the district court did, but it's all up here on appeal. So, I mean, how do you get punitives on top? Ordinarily in a breach of contract, you get whatever the contract provides, assuming your argument is right. But how do you go from that to skullduggery, conspiracy, fraud, punitives, all from paper? I know you're on a red light. I'm just telling you none of it's clear. So, I mean, that's a lot. If I could respond, I appreciate there's a lot to that question. I'll try to be very brief. $770 million actual damages flow straight from the pricing formula, and the figure is what it is because AT&T is the world's largest mainframe user, and that is the price. Out of these pockets, is that what you're saying? No, it's that the mainframe capacity, what they call MIPS in the technical terms, the million instructions per second, that actually is what dictates the price of the licenses. That's what the parties agreed to. So that's how the number, it spits out a number, and here it's because of the size. The $77,000 was the MIPS here. I'm sorry to get technical. But that is exactly why the number is what it is here. And then in terms of the punitive damages, it's a one-to-one. The district court did what all courts say is the reasonable thing to do on punitive damages, which it issued a measured, reasonable one-to-one ratio. And just one final point, this is the kind of case where failing to award remedies beyond compensation is going to fail to provide the deterrence that's needed for a party like IBM that thought it could simply bully another company and settle for pennies on the dollar. Let me ask you one other question. The subject came up about Section 8.1 for the damages, and the judge does hold off . . . I was trying to remember what that was about. That was the one that talked about a minimum discount of 27% or whatever, and the judge converts that into a fixed amount for damages. What evidentiary—I don't see that as a matter of the text. What evidentiary support is that? Right, and I'll point the court to a couple of different things. One is the district court made a finding on this, and that's at 8444-45, and that's where the district court ran through the evidence that he was relying on when he made a finding on that. We think it's clear as a matter of law, but to your point, Judge, he also made a finding. And what he relied on was the fact that the parties, in their conversations back and forth to each other, used 72%. They repeatedly used that as the number. And an example . . . But that doesn't mean—but they were just talking. I mean, that's not the same as, well, we've decided to accept your construction of 5.4, and therefore we're accepting this light. Okay. And I think that is one category of evidence, so, Judge Jones, but I have—there is more than that. The district court relied on more than that. IBM in its training manuals taught all of its employees worldwide that 72% was the number. But the training manuals that are with it is not the same as face-to-face negotiation between two sophisticated parties resulting in a contract between those parties. Then I have one more. They also had displaced in the past at the minimum discount. There's direct testimony on that. There's two different minimum discounts. One is 72%. That's what's relevant here for mainframes. There's a 45% for a different type of product. And there was direct testimony that they bought at the minimum discount in the past for doing displacements. So that's what the district court relied on, was that they'd done it before based on the minimum discount. They treated it internally as the rate. And that's how the parties talked about it with each other. So one other question. How do you reconcile your whole argument with the Bank of Australia or whatever was Australian Bank of Ireland transactions? So the Bank of—it's the National Australian Bank and the Bank of Ireland. And those are two incidents where they did displace. And as soon as BMC found out about it, they immediately objected. And IBM insisted on releases from liability for it. So those are not instances where IBM did it. You got away with it and you didn't sue them, right? We absolutely had a claim, but it was released as part of the 2013 OA negotiations for one of them as part of the 2015 OA negotiations for something else. I couldn't possibly tell you the value of those settlements because it was bound up in larger discussions going on. But those were absolutely things that BMC objected to and insisted on releases, or I should say IBM insisted on releases because of BMC's claim. And the past displacements doesn't in any way undermine BMC's position that they were unlawful in breach of the contract. Sorry. Yep.  Okay. Thank you very much. Thank you. Mr. Clement. Clement. Thank you, Your Honours. Just a few points in rebuttal focusing on the contract issues. First of all, my friend's argument that the displacement language is ambiguous really depends almost entirely on only reading half the clause. I mean, if the displacement language was there and there's nothing about discontinuing for other valid business reasons, he might have a point. But you obviously have to read this clause as a whole, and there's two textual clues that show you that it really has to be read as a whole. One is the word, while. I mean, he wants to say this isn't written as an exception, but it really is. It says, customer agrees that while the customer cannot displace, blah, blah, blah, blah, blah, customer may discontinue the use of. So these are two terms that are very closely tethered together. And then other valid business reasons is also a clue that these are tethered together. It doesn't say you can discontinue for any reason you want, because discontinuing is a completely different concept from displacement. It says other valid business reasons. But you just – I mean, in your previous argument, you said it's ambiguous. You said for present purpose. What do you want this Court to do? Do you want us to remand for a new trial on how to interpret the ambiguous contract, or do you want us to vacate everything on the basis that the contract is unambiguous? Well, I think – Your brief doesn't even – your original brief doesn't clearly say. Well, like most lawyers, I'd like to have my cake and eat it, too. But I think the right way to decide this actually is that the contract is ambiguous and that essentially you need to have a new trial on that. But I would say if you are going to say that – I mean, you know, I would say one more thing about the unambiguous, and then I'm going to say what you should do if you say that. The one other thing I wanted to say on its ambiguity, I think it's ambiguous on the plain text, but you have to read it against the backdrop of New York law that says you can't have an anti-competitive covenant to compete. And as Judge Jones accurately said, under their reading of the clause, Exhibit K looks like a territorial division of customers or a division of customers. Whereas under our reading, it's a perfectly fair deal. We can't use our specialized knowledge to essentially lure customers away on our own initiative. But if the customer wants to do it, the customer should get to make the switch, would be our view. But if you are going to say that – If found that, you know, it's ambiguous, whatever, there's a full trial, judge says X, says there's a breach, which you don't agree. And then we get to the money and we say, no, Kings X, you know, vacate, send back, whatever. Where does that leave you? Well, if you were to say that the contract was unambiguous in their favor, but they basically failed to prove any damages, that's actually a better result for me and my client. Because they didn't. They swung for the fences with this theory that they're entitled to $717 million. And this is what I would really implore you. If you were going to send it back because you think the contract is ambiguous, I would, in your opinion, say that they have no basis under the language of the contract to these $717 million. You're totally confusing us because your blue brief didn't really say what you wanted. The conclusion of the gray brief is the court should reverse. Alternatively, vacate and remand with instructions to apply the contractual damage limitation, which you're arguing is the $5 million. So now you're arguing maybe you should send it back for a new trial? So obviously as appellant, we will be satisfied with any relief that. . . Well, normally people come to us and they say A, B, C. So now we've got a menu. Now we're only judges. It's hard for us to do this. I understand it's hard, Your Honor. It's hard for us lawyers sometimes too. It does occur to me that if you say the contract is ambiguous, there probably needs to be a new bench trial. If you say that and you say that the contract does not entitle them to $717 million for good and sufficient reasons because the contract just doesn't say that, then this case will settle. But if you just send it back for a new trial and they think they can still knock it out of the park and get $717 million, I think they're going to play their lottery card and we're going to have another bench trial and we'll be back here in a couple of years. And if they win on remand, I'll be saying there's no way this contract provides for $717 million. So whatever else you do, I think you'd be doing us all a favor if you said this contract, as Judge Stewart suggested, just doesn't say if you violate 5.4, then you are entitled to the full amount. Forget the discount. The full amount of the license is under 8.1. It just doesn't say that. Thank you, Your Honors. All right. Thank you.